UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| татK POWER, INC., | No. C-04-5098 EMC |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AND PERMITTING ADDITIONAL DISCOVERY** |
| TEXTRON, INC., | |
| Defendant. | **(Docket No. 89)** |
| _____/ | |

Plaintiff TK Power, Inc. ("TK") seeks summary adjudication on the issue of Defendant Textron, Inc.' s ("Textron") liability for fraud, or in the alternative, on one or more elements of Plaintiff's fraud claim. Having considered the papers filed in support of and in opposition to the motion, and good cause appearing therefor, the Court **DENIES** the motion as there are disputed issues of material fact.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. TK's Allegations

According to the First Amended Complaint, Textron has a division named E-Z-GO which is the world's largest manufacturer of golf carts and utility vehicles. TK alleges that Textron identified TK's affiliate, TurnKey Solutions, Inc. ("TurnKey"), as a potential developer and supplier of a high frequency on-board solid state charger for use in golf and turf vehicles. FAC, ¶¶ 6,7. TK further alleges that TurnKey, on TK's and its own behalf, submitted to Textron a budgetary quotation for the cost of selling a charger based on an estimated annual usage of 75,000 units. *Id.*, ¶ 8. TK further alleges that on or about July 26, 2002, "Textron selected TK to develop and produce the chargers."

*Id.*, ¶ 10. TK further alleges that it "subsequently invested significant time and money into developing the charger and worked collaboratively with defendant for over a year." *Id.*, ¶ 11. According to TK, in or about February 2004, "defendant repudiated the parties' contract and gave notice of its refusal to perform." *Id.*, ¶ 13.

B.      The Lawsuit

On December 2, 2004, TK filed suit against Textron, asserting claims for (1) breach of contract, (2) breach of written contract, (3) promissory estoppel, (4) rescission and restitution, and (5) promise without intent to perform. On October 7, 2005, the Court granted TK's motion for leave to file an amended complaint. The First Amended Complaint adds two claims: promise without intent to perform – intentional misrepresentation (new second Cause of Action); and negligent misrepresentation (new third Cause of Action).

Textron filed a motion to strike the first amended complaint, which the Court denied on November 28, 2005. In its motion to strike, Textron unsuccessfully argued that its answers to TK's requests for admission could not support TK's claim that Textron/E-Z-GO (hereinafter used interchangeably) never intended to comply with its promise. *See* Defendant's Brief in Support of Motion to Strike First Amended Complaint at 5 (Docket No. 61). The Court ruled that the authorities cited by Textron did not hold "that one cannot infer a fraudulent intent based on a response to a request for an admission." Nov. 28, 2005 Order Denying Defendant's Motion to Strike (Docket No. 77). In this Court's prior order granting leave to amend, the Court ruled: "TK contends that scienter is inferred from the fact that Textron 'has expressly denied in its admissions responses that it had planned to buy on-board high frequency chargers from TK when it entered into the agreement with TK.' Reply at 4 . Such an allegation, if provided in a more definite statement, will suffice."

TK has now filed a motion for summary adjudication on its claim for promise without intent to perform/intentional misrepresentation and for punitive damages for this fraud. In the alternative, TK seeks adjudication on one or more of the facts upon which TK predicates its claims for promise without intent to perform/intentional misrepresentation.

2

C.   Documents Related to TK's Motion

In a July 10, 2001 letter from Textron employee Jason Hyland to TK's Chief Technical Officer Robert Taylor, Hyland stated as follows: "We, here at E-Z-Go, are in the preliminary phases of developing a high frequency charger for our golf and turf vehicles. Attached you will find a list of items we would like to see in this new generation charger. Please review this list and submit a budgetary quote based on an EAU of approximately 78,000 units." Taylor Decl., ¶ 3 and Ex. 1. In a March 28, 2002 letter from Textron employee Susan Laywell to Taylor's attention, Laywell informs TurnKey that it has "been identified as a potential supplier to quote on E-Z-GO's On Board Solid State Charger Requirements," and that "[t]he annual usage is aprox. [sic] 75,000 units." *Id.*, ¶ 4 and Ex. 2. In a letter dated April 11, 2002 from Taylor to Laywell, TK provided a quotation of $119.70 per charger based on this estimated annual usage. *Id.*, ¶ 5 and Ex. 3.

In a July 22, 2002 letter from Textron employee Stacey Gordon, Product Engineering to Taylor, Gordon stated that "[t]he down the line date for this project has been moved to January 2004. We intend to have the project and all testing complete before the December 2003 Christmas shutdown. I would like to have five (5) units for lab testing by December 2002 and 100 to 150 units for a pilot in March 2003." *Id.*, ¶ 6 and Ex. 4. In a July 26, 2002 letter to Taylor, Gordon indicated "we have selected TK Power, Inc. to develop the next generation E-Z-GO charger," and referred to his previous letter outlining "the timeline for a January 2004 production date." *Id.*, ¶ 7 and Ex. 5.

D.   Testimonial Evidence

1.   TK Witnesses

TK's former CTO, Robert Taylor, attests that, to his knowledge, Stacey Gordon was Textron's authorized agent from the beginning of the battery charger project through approximately October 2003. Taylor Decl., ¶ 9. Taylor attests that in 2002, Gordon told him orally that Textron had selected TK as its exclusive partner for development and production of chargers and that the target date for production was 2004. *Id.*, ¶ 10. Taylor further attests that Gordon orally confirmed several times in or about October and November 2002 that Textron would purchase chargers from TK once the charger development phase was successfully finished. *Id.*

TK's president, Gene Tenczar, attests that Gordon stated in his presence "that Textron had selected TK to supply battery chargers, or words to that effect, and that Textron needed TK to mass-produce chargers for it by 2004. Gordon specifically stated that Textron expected TK to be producing chargers for it by 2004." Tenczar Decl., ¶ 4. Tenczar attests that he "had no reason to believe that Textron did not intend to fulfill its promises until Textron stopped responding to TK in or about November 2003," at which time "Textron did not expressly terminate the agreement and continued to indicate some interest in working with TK to develop chargers." *Id.,* ¶¶ 6, 7. In reliance upon Textron's promises to purchase chargers from TK, Tenczar directed TK to spent over 1,000 man-hours and nearly $800,000 from 2002-2004 in charger development efforts. *Id.*, ¶ 8. Textron paid TK $37,500 toward the agreement for development and mass-production of chargers. *Id.*, ¶ 9.

    2.    <u>Textron Witnesses' Testimony and Objections Thereto</u>

        a.    <u>Stacey Gordon</u>

At his deposition, Stacey Gordon testified as follows:

```
Q.   Okay.  And when you did discuss with the potential developers, manufacturers, did
     you discuss -- did you ever discuss with any of those companies the possibility that
     they might just develop prototypes as opposed to mass produced chargers?
A.   No.
Q.   . . . was it your understanding all along that the project was for mass production in
     addition to producing prototypes?
A.   The ultimate goal was to produce production chargers.
Q.   Okay.  And was it your understanding that that was -- the agreement was to produce
     production chargers?
A.   Yes.
Q.   Okay.  And was it your understanding that that was the agreement between Textron
     and TK Power, to produce chargers for mass production?
A.   Upon successful completion of the testing.
Q.   Okay.  Successful completion of the testing of the -- whatever, the prototypes or the
     gamma run or whatever?
A.   Correct.
Q.   Okay.  So your understanding was that that was just simply a prerequisite and the
     agreement was for mass production, correct?
A.   We had to meet the testing requirements; then the agreement was for mass
     production, yes.
```

Clark Decl., Ex. B (Deposition Transcript of Stacey Gordon) at 305:13-307:1 (objections omitted).

TK objects to Gordon's testimony relating to his discussions with other manufacturers as irrelevant to Textron's intent to keep its promise with TK, and that his understanding is irrelevant

4

Textron's intentions. However, as TK's own witnesses have testified, Stacey Gordon was "an authorized agent of Textron" and was directly involved in the battery charger project. Tenczar Decl., ¶ 4; Taylor Decl., ¶ 9. Gordon's involvement in negotiating the battery charger agreement makes his understanding directly relevant to Textron's intent. TK's objection is overruled.

### b. Greg Schlachter

Textron also offers the testimony of Greg Schlachter. Schlachter testified that Gordon wrote a letter of intent which he understood to mean that "if you develop this and it works, then we will buy from you." Clark Decl., Ex. C (Deposition Transcript of Greg Schlachter) at 77:8-14. Schlachter further testified that he reviewed a documentation package about the TK Power/Textron agreement and concluded "that we had an agreement with Mr. Tenczar to develop the five prototypes for us, and then **if** everything met to all the testing and all the procedures, we went through all the gates, that Mr. Tenczar would supply us chargers," and that "**upon successful development** . . . we would have proceeded with Mr. Tenczar." *Id.* at 293:12-294:1 (emphasis added).

TK objects to the admission of Schlachter's proffered testimony on the ground that his interpretation of the agreement is irrelevant. The objection is overruled. Schlachter was involved with the evaluation of the chargers and the decision whether to go forward. Brown Decl. in Support of Reply, Ex. 6 (Deposition of Schlachter). His understanding and interpretation of the agreement is relevant to Textron's intent and state of mind.

### c. Susan Rutt

Textron offers the testimony of Susan Rutt, E-Z-GO's Vice President of Engineering, *see* Opp. at 4, who testified as follows: "My understanding of the agreement was that there were three parts to it. One was they were to deliver the first five working samples, and if that was accomplished, we were to progress to the 150 Beta samples. If that was successful, we were to progress to production." Clark Decl., Ex. D (Deposition Transcript of Susan Rutt) at 69:3-8.

TK objects to Rutt's interpretation as irrelevant to Defendant's intention at the time the agreement was made. Pl's Objections at 6-7. The objection is overruled. Rutt has been the vice president of the Engineering Division at E-Z-GO since June, 2003 and has knowledge regarding

Textron's decision not to proceed with the charger. Brown Decl. in Support of Reply, Ex. 5 (Deposition of Rutt). Her understanding even after the fact of the alleged misrepresentations has probative value as to Textron's intent and state of mind.

E.   Discovery Responses at Issue: RFAs

In response to TK's Request for Admissions, E-Z-GO denied Request No. 3 which asked to admit: "In the summer of 2002, you selected TK Power to develop and produce an on-board high frequency charger for you." E-Z-GO denied the request and stated in its narrative response that "on July 26, 2002, E-Z-GO selected TK Power as the company from whom they agreed to purchase five properly functioning and fully compliant prototype high frequency battery chargers." Brown Decl., Ex. 1 (E-Z-GO's Second Supplemental Responses to Request for Admissions, Set One).

TK also propounded Request No. 8 which asked E-Z-GO to admit: "At some time in 2002, you planned to buy on-board high frequency chargers from TK Power after successful development of an on-board high frequency charger and completion of testing of it." E-Z-GO denied the request and provided the narrative response that "E-Z-GO agreed to purchase five properly functioning and fully compliant prototype battery chargers from TK Power." *Id.*

### III.   DISCUSSION

A.   Legal Standard for Granting Summary Adjudication, or Partial Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[a] party seeking to recover upon a claim . . . may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. Proc. 56(a). Under Rule 56(c), the moving party has the burden of showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 768 (9th Cir. 1981); Fed. R. Civ. P. 56(c).

Rule 56(d) further provides that if "judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleading and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without

substantial controversy . . . and directing such further proceedings in the action as are just." Fed. R. Civ. P. 56(d). Rule 56 thus "'authorizes a summary adjudication that will often fall short of a final determination, even of a single claim.'" *Lies*, 641 F.2d at 769 n.3 (quoting 6 Moore's Federal Practice ¶ 56.20(3.-2) (2d ed. 1976)). The purpose of summary adjudication is to "'avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit.'" *Id.* (citation omitted).

Where the plaintiff has the ultimate burden of proof, it may prevail on a motion for summary judgment only if it affirmatively demonstrates that there is no genuine dispute as to every essential element of its claim. *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

B.   Elements of Fraud

Neither party disputes that California substantive law applies. In order to prevail on its motion for summary adjudication, TK must prove the following elements of fraud: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Here, TK alleges actual fraud, which occurs "when a party to the contract intends to deceive another party to the contract or to induce another party to enter into the contract on the basis of a promise made without any intention of performing it or any other deceitful act." *Walter E. Heller Western, Inc. v. Tecrim Corp.*, 196 Cal. App. 3d 149, 160 (1987). Under California law, "the essence of actual fraud is 'the existence of an intent at the time of the promise not to perform it' which is always a question of fact." *Id.* at 160-61 (citation omitted); Cal. Civ. Code § 1574 ("Actual fraud is always a question of fact.").

7

TK seeks summary adjudication on its promissory fraud claim ("promise without intent to perform – intentional misrepresentation" (Second Cause of Action)), or on one or more of the elements of its claim. As discussed below, there are genuine disputes of material fact that preclude judgment as a matter of law under the record before the Court. There are conflicting interpretations about the parties' agreement and/or understanding relative to this transaction.

1.   Misrepresentation

"A promise, made without any intention of performing it," may constitute actionable deceit. Cal. Civ. Code § 1710. *See* Cal. Civ. Code § 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."). Here, the parties did not execute a written contract. *See* Clark Decl., Ex. C (Deposition of Schlachter) at 77:5-7. Instead, the parties' understandings and obligations relative to this transaction turns on the exchange of correspondence, alleged oral conversations, and each of the parties' respective understanding.

TK points to four misrepresentations allegedly made by Textron:

(1) **Textron falsely promised TK that it was "selected" to mass-produce chargers, as evidenced by the 2002 correspondence.** The plain language of Gordon's letters, however, indicates that TK was selected "to develop the next generation E-Z-GO charger." Taylor Decl., Ex. 5. Although there is discussion of a production timeline, "development" would appear to precede production. Moreover, Textron's witnesses testified that production was conditioned upon successful development of the charger prototypes.

Textron's denials of RFA Nos. 3 and 8 are not dispositive. First, denials, unlike admissions, do not have a conclusive effect under Fed. R. Civ. P. 36. *Audiotext Communication Network, Inc. v. U.S. Telecom, Inc.*, 1996 WL 625744 at *7 (Oct. 5, 1995). Second, although an explanatory narrative accompanying a denial may have evidentiary, perhaps even preclusive value in some contexts (*see Rolscreen Co. v. Pella Products of St. Louis, Inc.*, 64 F.3d 1202, 1210 (8th Cir. 1995)), in this case, the combination of the wording of the RFAs and Textron's narrative responses leave room for ambiguity. They do not preclude the possibility that Textron intended or agreed to purchase chargers from TK on a mass production basis if the prototypes were successfully

8

1  developed.  RFA No. 3 does not account for this contingency.  As to E-Z-GO's denial of RFA No. 8
2  refusing to admit that it "planned" in 2002 to buy the chargers after development and testing, there is
3  ambiguity as to timing (did E-Z-GO plan to purchase in 2002, or did it have a plan in 2002?) and as
4  to the meaning of "planned."  The RFA does not use the term *e.g.*, "agreement" or any other word
5  that would have been more precise.  Although Textron could and should have met and conferred
6  with TK to clarify the ambiguity, the current state of the record does not resolve the ambiguity.  *See*
7  *Rolscreen Co.*, 64 F.3d at 1210 ("The conclusive effect envisioned by [Fed. R. Civ. Proc. 36] may
8  not be appropriate where requests for admissions or the responses to them are subject to more than
9  one interpretation.").

10  Thus, it cannot be said there are no genuine disputes of material facts as to this alleged
11  misrepresentation.  Both the nature of the promise, if any, made by Textron and its falsity are at
12  issue and in dispute.

13  (2) **Textron falsely promised that it intended to purchase the mass-produced chargers,**
14  **as evidenced by the 2002 correspondence.**  For the same reasons stated above, there are genuine
15  disputes of material fact as to whether Textron falsely made such a promise.

16  (3) **Textron, through its agent Stacey Gordon, made a false oral promise that it agreed**
17  **to select TK to mass-produce the chargers, as recalled by Taylor and Tenczar.**  Taylor,
18  however, qualifies some of Gordon's comments, indicating that "Textron was going to be
19  purchasing chargers from TK once the charger development phase was successfully finished."
20  Taylor Decl., ¶ 10.  Thus, there is evidence that no unconditional promise was made.  Moreover, as
21  Textron points out, Gordon could not recall the specifics of any such conversation (Deposition of
22  Gordon, ¶. 92-93), and given his testimony that any future purchase were contingent on successful
23  development and testing, there is a genuine issue of fact whether Gordon made such a promise and
24  whether it was false.

25  (4) **Textron made a false oral promise in 2002, through Gordon, that it would purchase**
26  **chargers from TK after development.**  TK argues that Textron did not intend to purchase mass-
27  produced chargers, even after successful development, as evidenced by its denial to TK's Request
28  for Admission No. 8.  TK thus contends that Gordon misrepresented Textron's intention by agreeing

9

to purchase chargers conditioned on the successful development. However, for the same reasons stated above, there is a disputed issue of fact as to whether any such promise were made and whether they were false. RFA No. 8 and E-Z-GO's response are ambiguous.

### 2. Knowledge of Falsity, or Scienter

The only evidence offered by TK that Textron knew the falsity of its alleged misrepresentations is Textron's responses to the RFAs, implying that in Textron did not plan in 2002 to purchase chargers from TK even after development and testing. As discussed above, TK's requests for admission and Textron's responses are ambiguous and do not eliminate disputed issues of material fact.

### 3. Misrepresentation to Induce Reliance

TK must produce evidence beyond mere nonperformance to support its claim that Textron intended to defraud are indice to TK's reliance. *Fanucchi & Limi Farms v. United Agri Products*, 414 F.3d 1075, 1088 (9th Cir. 2005). As discussed above, there are material issues of fact as to whether there was an intentional misrepresentation made by Textron. Based on the current record, it cannot be said as a matter of law precisely what was promised in respect to mass production of the chargers and what Textron intended beyond the purchase and development of the prototypes.

### 4. Justifiable Reliance

"'Justifiable reliance is an essential element of a claim for fraudulent misrepresentation.'" *Southern Union*, 180 F. Supp. 2d at 1033 (quoting *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (1991). "'Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction.'" *Id.* (quoting *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995)). "'The reasonableness of the reliance is ordinarily a question of fact,' but 'whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts.'" *Id.* (quoting *Guido*, 1 Cal. App. 4th at 843).

Here, TK has offered declarations from its president indicating that it would not have spent time and money on developing the chargers if it had know that Textron did not intend to select TK

to mass-produce them. Tenczar Decl., ¶ 8. But the reliance turns in part on what precisely was promised or represented by Textron. There are disputed issues of fact on this issue. Moreover, the reasonableness of TK's reliance on bidding correspondence and oral statements where there is no written contract is in question and cannot be decided as a matter of law.

###### 5. Damages

Other than a summary statement, TK has offered no detailed evidence of the amount it spent on the battery charger project. The amount of damages is a question of fact that should be reserved for trial. *See* Mot. at 4 ("plaintiff was damaged by at least $700,000, or in an amount to be proved at trial, for the monies it spent in reliance on defendants' promises from 2002-2004").

Furthermore, on its claim for punitive damages (FAC, ¶ 43), TK must prove by clear and convincing evidence that Textron committed fraud. *Southern Union Co. v. Southwest Gas Corp.*, 180 F. Supp. 2d 1021, 1042 (D. Ariz 2002) (citing Cal. Civ. Code § 3294). Here, there are genuine issues of material fact as to the alleged misrepresentation and inducement, precluding any finding as a matter of law on punitive damages as well.

## IV. CONCLUSION

TK's objections to Textron's evidentiary submissions are overruled. TK's motion for summary adjudication is denied.

TK's request to propound additional RFAs is granted. Textron's witnesses testified there was an "agreement" to purchase a mass production of charges if, *inter alia*, testing of prototypes were successfully completed. Yet it refuses to enter into a stipulation so stating. Textron's response to RFA No. 8 does not appear complete, due in part because of the inartfulness of the wording of the request.

In the interest in focusing the parties on the precise legal and factual issues and streamlining this litigation -- neither party has served this function well with poorly worded requests and less than complete and entirely forthright responses -- the Court will permit TK to propound up to five (5) precisely worded RFAs. If Textron believes these are ambiguous, it must meet and confer with TK to seek clarification and then respond fully and in good faith. The Court will not look favorably upon wasteful, inefficient discovery and pre-trial preparation which has marked this litigation. The

inability of the parties to reach a stipulation on matters that would appear undisputed and which would narrow the issues for trial is but one example of the wasteful manner in which this litigation has been handled.

This order disposes of Docket No. 89.

IT IS SO ORDERED.

Dated: March 22, 2006

_____
EDWARD M. CHEN
United States Magistrate Judge

12