**United States District Court**
For the Northern District of California

1
2
3
4
5              UNITED STATES DISTRICT COURT
6              NORTHERN DISTRICT OF CALIFORNIA
7
8   TK POWER, INC.,                              No. C-04-5098 EMC
9              Plaintiff,
10       v.                                      **ORDER RE UCC JURY**
                                                 **INSTRUCTIONS**
11  TEXTRON, INC.,
12             Defendant.
    _____/
13
14
15                    I.   **BACKGROUND**
16       This case involves a failed transaction that contemplated the development and production of
17  high frequency on-board battery chargers for electric golf carts.  At the time the parties commenced
18  discussion, the product represented new technology that had not been previously incorporated into
19  this context.  In addition to the use of high frequency circuit board-based (as opposed to transformer-
20  based) technology, the power supply was to be placed on board the golf cart and connected to the
21  batteries throughout daily use, rather than residing off-board in a cart barn.  In addition to more
22  efficient charging, it was thought that the on-board charger could perform *inter alia* certain real-time
23  monitoring and regulation facilitative to longer battery life.
24       Plaintiff TK Power ("TK") was approached by Defendant Textron/E-Z-GO ("Textron") as
25  one of several potential vendors to develop the product.  After a number of discussions, Textron
26  indicated to TK it had selected TK to develop the product.  Although the parties dispute the precise
27  nature of the legal obligations respectively undertaken (indeed that is the point of this lawsuit), they
28  agree that what was contemplated was a three stage development process.  In the first stage, TK was

**United States District Court**
For the Northern District of California

1  to provide five working prototypes for laboratory testing.  Once those prototypes tested successfully,

2  TK would then produce 100 to 150 Beta units for field use and testing.  If successful, TK would then

3  undertake the mass production of approximately 75,000 units per year.

4        An exchange of correspondence ultimately led to TK submitting a formal quotation to

5  Textron.  The quotation was for (1) software code containing the Textron-provided algorithm to

6  operate the microprocessor in the battery charger, (2) five prototypes for test and evaluation, (3) heat

7  sinks and tooling (necessary for the custom production) for the prototypes, and (4) 150 Beta test

8  units.  Textron subsequently issued a purchase order for the first three items related to the

9  prototypes.  No purchase order was not issued for the Beta units.

10        Thereafter, TK commenced development work, including design of the charger hardware and

11  writing of the software based on the algorithm provided by Textron. Importantly, as this was a new

12  produce being evolved, TK's work in attempting to produce the design, development and production

13  of the prototypes was completely custom.  Also the bulk of the purchase order price, $39,000, was

14  allocated to proprietary software coding.  Another $20,000 as allocated for the production of the 5

15  prototypes at $4,000 a piece.  This price was more than 33 times TK's proposed price of the final

16  product at $119.70.

17        The development and production of the prototypes ran into significant problems, and the

18  transaction never progressed beyond the first stage.   In this litigation, each party places blame on

19  the other.  Each alleges the other was at fault for the delays that ensued.  The parties also dispute

20  whether TK actually produced five working prototypes pursuant to the parties' agreement, the terms

21  and conditions of which are themselves in dispute.  Ultimately, Textron cancelled the project.

22        TK brought the instant case for breach of contract, fraud and misrepresentation.  In its breach

23  of contract claim, TK contends it performed its obligation under the contract and that Textron

24  breached the contract by cancelling the transaction, thus depriving TK of the profits it would have

25  earned on the mass production of the charges (the last phase of the development).  As a predicate to

26  its damages claim, TK contends there was a contract for the entirety of all three phases of the

27  development and that Textron's cancellation and breach at the first prototype stage renders Textron

28  liable for lost profits which would have been earned under the entire contract, including that from

2

United States District Court

For the Northern District of California

1  the mass production and sale of the 75,000 chargers per year.  Textron contends, on the other hand,

2  that TK breached the contract by failing to produce the five working prototypes in a timely fashion,

3  thus entitling Textron to cancel the contract for the prototypes.  Textron further contends that the

4  only contractual agreement was for purchase of the prototypes.  It denies there was any contract

5  established for the Beta phase or mass production.

## II.   ANALYSIS

7      The question before this Court arises out of the parties' proposed jury instructions.  The

8  parties had jointly proposed a series of instructions on the based on common law contract principles

9  – covering such matters as the elements for the formation of a contract, the elements of a breach of

10  contract, modifications, substantial performance, interpretation, timeliness of performance, delay

11  and excuse, waiver of breach and anticipatory breach.  However, Textron seeks supplemental

12  instructions under the Uniform Commercial Code.  After discussions with the Court, it agreed to

13  withdraw some of those instructions, but still insists on the giving of three UCC instructions on:  (1)

14  express warranties, (2) buyer's right to cancel where seller does not provide conforming goods, and

15  (3) TK's obligation to tender delivery of conforming goods within the promise time frame.

16  According to Textron, the UCC imposes the "perfect tender"rule; substantial performance or

17  reasonable delay otherwise permitted under the common law is not allowed under the UCC.  Textron

18  therefore asks that the jury instruction on reasonable delay and substantial performance (to which

19  Textron had earlier agreed via its submission of the joint jury instructions) be omitted.  TK argues

20  that the UCC does not apply and urges the Court to retain the common law contract instructions.

21      The issue is whether the common law or UCC applies to the contract or portion of the

22  contract (*i.e.* development and production of 5 working prototypes) allegedly performed or not

23  performed by TK – the focus of this suit.

24      The UCC applies to "transactions in goods."  Cal Comm. Code Section 2102. "Goods" are

25  defined in the Code as "all things (including specially manufactured goods) which are movable at

26  the time of identification to the contract for sale . . . " Cal. Comm. Code Section 2105.  The UCC

27  does not apply to transactions involving service.  Complications arise when the transaction involves

28  both goods and services.  The courts have held application of the UCC in these instances turns on

3

United States District Court

For the Northern District of California

1   the "essence" of the agreement. *Filmservice Laboratories, Inc. v. Harvey Bernhard Enterprises,*

2   *Inc.*, 208 Cal.App.3d 1297, 1305 (1989); *RRX Industries, Inc. v. Lab-Con, Inc.*, 72 F.2d 543, 546

3   (9th Cir. 1985)  The court discerns what is the predominant factor – whether the thrust is the

4   rendition of service with goods incidentally involved or whether the transaction is a sale of goods

5   with labor incidentally involved. *United States ex rel. Bartec Industries, Inc. v. United Pacific Co.*,

6   976 F.2d 1264, 1277 (9th Cir. 1992).

7           The issue of mixed or hybrid goods and services often arises in the context of transactions

8   involving software.  "Because software packages vary depending on the need of the individual

9   consumer, we apply a case-by-case analysis." *RRX Industries, Inc.*, 772 F.2d at 546.  In *RRX,* the

10  defendant agreed to supply plaintiff with a software system for use in its medical laboratories.

11  Under the contract, defendant was obligated to correct any malfunctions that arose.  The court held

12  the sales aspect of the transaction predominates and that the employee training, repair and system

13  upgrades were incidental to the sale of the software package.  *Id.  See also the Colonial Life*

14  *Insurance Co. Of America v. Electronic Data Systems Corp*, 817 F. Supp. 235 (D.N.H. 1993)

15  (license of computer software governed by UCC).

16          In contrast, in *Data Processing Services, Inc., v. L.H. Smith Oil Corp.*, 492 N.E.2d 314 (Ct.

17  App. Ind 1986), the court found the software transaction was one for service.  The plaintiff was in

18  the business of custom computer programming and agreed to develop computer software, data

19  processing system and accounting system to meet defendant's specific needs.  The court noted that

20  the defendant "bargained for DPS's skill in developing a system to meet its specific needs. . . [I]t

21  was DPS's knowledge, skill, and ability for which Smith bargained." *Id*. at 318-19.  The court

22  contrasted cases involving the sale of standardized software and distinguished *RRX* as a case

23  involving a prepackaged product not specifically developed for the buyer. *Cf. Miller Farms*

24  *Nursery, Inc. v. Nedegaard Construction Co.*, 2003 WL 21500052 (9th Cir. 2003) (agreement to

25  pave parking lot including installation of curbs and installation of septic system, retaining walls,

26  landscaping, and sprinkler system found to be predominantly a sale of service).

27

28

4

United States District Court

For the Northern District of California

1       Focusing on Textron's purchase order in this case, the essence of that agreement was for

2 service, not goods.  While it is true that the purchase order covered the production of mechanical

3 items – five pre-production chargers and heat sinks – most of the price was for the development of

4 software code.  In this regard, this transaction is far more akin to *Data Processing Services* than

5 *RRX*.  Furthermore, even as to the prototypes, the purpose of the purchase order was not the sale of

6 five chargers to be used by Textron or sold by Textron to consumers.  Rather, the prototypes were

7 designed for "test and evaluation" (quoting from TK's quotation) in the laboratory to see if the

8 product was ready for the next stage of development – testing of Beta units in the field.  The purpose

9 of the prototype was to reduce a concept to a working model as a predicate for further development.

10 In contracting with TK for the development and production of the prototypes, Textron was

11 bargaining more for TK's "knowledge, skill, and ability," *Data Processing Services, Inc.*, 492

12 N.E.2d at 318-19, that it was for the actual material goods.  That technology was the focus of the

13 purchase order is confirmed by the fact that the price for the prototype was 33 times the expected

14 price of the ultimate mass produced charger.  This reflected development, not materials, cost.

15       Tellingly, Textron has not cited a single case in which a prototype or model for development

16 purposes has been deemed "goods" for purposes of applying the UCC.  Rather, the Court finds

17 *Dawley v. La Puerta Architectural Antiques, Inc.*, 133 N.M. 389, 62 P.3d 1271 (Ct. App. N.M.

18 2002) instructive.  In that case, La Puerta contracted with Dawley for the construction of 13 custom

19 doors made or rare woods in connection with the construction of a house.  La Puerta submitted a 2

20 by 2-foot corner section sample of a door made of a different wood for approval by Dawley and his

21 architect.  The sample was rejected and the contract terminated.  Dawley argued that La Puerta

22 violated the UCC in delivering nonconforming goods.  The court rejected the argument, holding that

23 the "sample was not a true 'sample' or an example of the goods themselves, but, rather, was a

24 preliminary model or prototype that preceded the delivery of actual goods." *Id.* at 1278.  While the

25 purchase order transaction here differs from *La Puerta* in that TK obligated itself to deliver actual

26 samples in the form of five prototypes, their function was that of a "preliminary model or prototype

27 that preceded the delivery of actual goods" – the mass produced commercialized chargers.

28

1    That the prototype contract, by itself, would not constitute a sale of "goods" so as to invoked

2    the application of the UCC does not answers the ultimate question, however.  Here, TK alleges this

3    was part, the first part, of a larger contract which encompassed the production of Beta units followed

4    by the mass production of 75,000 chargers per year.  Neither side disputes that the UCC would have

5    applied to the production and sale of the mass produced commercialized chargers.  Although

6    Textron denies there was such an overall contract, it argues that should such a contract be found and

7    the jury is requested to award damages based on such an entire contract, the essence of such an

8    overall contract would be for the sale of "goods," and thus the jury should be instructed on the UCC.

9    TK counters that although the UCC might be applied to the sale of the mass produced charges, the

10   common law should be applied to that portion of the contract which is the focus of the trial herein –

11   TK's successful (or not) development of the prototypes.  TK contends it is appropriate to apply the

12   common law to this portion of the contract and the UCC to the portion of the contract for mass

13   production.  Textron contrarily argues that the Court should determine the essence of the contract as

14   a whole and apply one body of law, the UCC, to its entirety.

15   The Court concludes that TK's position is correct.  A number of courts have held that where

16   a transaction involves a mix of "goods" covered by the UCC and non-goods such as service or real

17   estate, the court may apply non-UCC law to that portion of the contract that does not involve

18   "goods."  In *Hirschfield Sons Co. v. Colt Industries Operating Corp.*, 107 Mich.App. 720, 309

19   N.W.2d 714 (Ct.App. Mich. 1981), plaintiff contracted with the defendant scale manufacturer to

20   purchase a large in-ground railroad and truck scale and to have it installed.  Installation entailed

21   excavation and creation of a concrete pit.  The concrete pit was later found to be defective as the

22   floor was not sufficiently thick.  Noting that the contract provided separate provisions and prices for

23   the sale of the scale and its installation and the fact that the claimed defect was with the installation

24   and not the scale, the court found the UCC and its applicable limitations period inapplicable to the

25   plaintiff's claim for breach.  In the instant case, there was a separate quotation for the development

26   of the software and development and production of the prototypes.  The prices therefor were

27   separate from the quoted price of the Beta units or the discussed price for the mass produced units.

28

United States District Court

For the Northern District of California

6

As in *Hirschfield Sons Co.*, the claimed defect pertained to the prototypes, not to the Beta or mass produced units.

Other courts have applied non-UCC law to segregable portions of a contract even where separate prices were not stated in the contract. In *Foster v. Colorado Radio Corp.*, 381 F.2d 222 (10th Cir. 1967), there was a contract for the sale of assets of a radio station which included both goods as well as the license, good will, real estate, studios and transmission equipment which were not movable and thus not "goods." The court viewed the contract in two parts – the sale of goods and non-goods – and found the UCC applicable to the former but not latter. *Id*. at 226-27. No separate price was stated for these items. In *Stephenson v. Frazier*, 399 N.E.2d 794 (Ct.App. Ind. 1980), the plaintiff purchase a modular home from the defendant. The single purchase price included the installation of a septic tank system and construction of a foundation. The court found the UCC inapplicable to the part of the contract relating to the construction of the foundation and installation of the septic system because they were not "goods" and constituted services. *Id*. at 797. The modular home was covered by the UCC.

It is evident from these cases that the amenability of a transaction to bifurcated treatment under UCC and non-UCC law does not depend on whether the contract is divisible or severable under the traditional common law since a critical element of divisibility under the common law is the apportionment of consideration support each part of a divisible contract. *Hudson v. Wylie*, 242 F.2d 435, 447 (9th Cir. 1957).[1] Rather, this Court concludes that consideration should be given to three factors:

1.      Whether the non-goods aspect of the transaction is clearly distinct and easily separable from the goods aspect. In *Hirschfield, Foster* and *Stephenson*, the performance of the non-goods aspect of the contract was distinct and easily separable from the goods aspect. This stands in

---

[1] Moreover the legal implications of divisibility under common law contract principles has different implications than those at issue here. Where a contract is found divisible, failure of one party to perform one severable part does not bar recovery for performance of another part as would normally be the case where there is an entire contract. *Lowy v. United Pac. Ins. Co.*, 67 Cal.2d 87, 91 (1967). Here, the issue is whether a party is barred from seeking performance of some portion of a contract having breached another portion. Rather, it simply concerns whether one legal principle should be applied to one aspect of the contract but not another in judging performance.

**United States District Court**
For the Northern District of California

1   contrast to *e.g.* the installation of pre-packaged software which requires customization where the

2   goods and service aspects are closely intertwined.

3        2.      Whether the alleged performance or non-performance pertains solely to the non-

4   goods aspect of the transaction.  *Cf. Hirschfield Sons Co., supra*.

5        3.      Whether it makes sense to apply the UCC to the non-goods aspect of the transaction.

6   For instance, in *Hirschfield Sons Co.*, it made sense to apply the more lenient limitations period than

7   the four year period applicable under the UCC since the defect in the concrete pad under the scale

8   was much more difficult to discover than a defect in the scale itself.   In the instant case, it seems

9   particularly inapt to apply such UCC principles as the implied warranty of merchantability (Cal.

10   Comm. Code § 2314) to the development of a prototype especially where, as here, that development

11   itself was an evolving process entailing the interaction of both parties as specifications, algorithms

12   and designs for the prototypes changed during its course.  Moreover, the purpose of the prototypes

13   was not for consumption but to serve as a predicate to development of the ultimate product.  *Cf.*

14   *Dawley*, *supra*.

15        All three factors are present here.  Under these circumstances, even if it is assumed that there

16   was a larger agreement of which the prototype development was only a part, applying the common

17   law to this segregable portion of the transaction comports with the purposes of the UCC to

18   "simplify, clarify, and modernize the law governing commercial transactions."  Cal. Comm. Code §

19   1102.  Accordingly, the Court will instruct the jury consistent with the common law contract

20   principles, not the UCC.

21

22        IT IS SO ORDERED.

23

24   Dated:  May 17, 2006

25

26                        EDWARD M. CHEN
                     United States Magistrate Judge

27

28